UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

ROSEMARIE SCHIRRIPA, Individually : 
and On Behalf of All Others Similarly :
Situated, :     Case No.
 :
               Plaintiff, :
 :
      - against - :     **CLASS ACTION COMPLAINT**
 :
BIG HEART PET BRANDS, INC. and :
THE J.M. SMUCKER COMPANY, :     **JURY TRIAL DEMANDED**
 :
            Defendants. :
 :
 :
 :
 :
 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

       1.      Plaintiff Rosemarie Schirripa, individually and on behalf of all others similarly situated, by and through her attorneys, brings this Class Action Complaint against Defendants Big Heart Pet Brands, Inc. and The J.M. Smucker Company to cause Defendants to disclose that its pet food sold throughout the United States contains pentobarbital and to obtain damages for the consumers and businesses that purchased the Contaminated Dog Food (as defined below) during the time that Defendants failed to make such disclosures. Plaintiff alleges the following based upon personal knowledge, as well as investigation by her counsel, and as to all other matters, upon information and belief.

## INTRODUCTION

       2.      Defendants manufacture, market, advertise, label, distribute, and sell Kibbles 'n Bits (the "Contaminated Dog Food").[1] The Contaminated Dog Food contains pentobarbital, a

---

[1] Discovery may reveal additional products that also contain Pentobarbital and Plaintiff reserves her right to include any such products in this action.

barbiturate drug used as a sedative and anesthetic for animals. Pentobarbital is now most commonly used to euthanizing dogs and cats. [2]

3.      Pentobarbital is a Class II controlled substance and there is no safe or set level for pentobarbital in pet food. If it is present, the food is adulterated.[3] The ingestion of pentobarbital by a pet can lead to numerous adverse health issues:

- Tyalism (salivation);

- Emesis (vomiting);

- Stool changes (soft to liquid stools, blood, mucus, urgency, explosive nature, etc.);

- Hyporexia (decreased appetite);

- Lethargy/depression;

- Neurologic abnormalities (Tremor, seizure, vocalization, unusual eye movements);

- Ataxia (difficulty walking);

- Collapse;

- Coma; and/or

- Death.[4]

4.      Despite laws governing pet foods and providing government oversight, the FDA has stated that "[p]et food manufacturers are responsible for taking appropriate steps to ensure that the

---

[2] Petplace. "Penobarbital for Dogs and Cats, July 16, 2015, https://www.petplace.com /article/druglibrary/drug-library/library/pentobarbital-for-dogs-and-cats/
[3] http://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm544348.htm
[4] The Honest Kitchen, "Pentobarbital- What Is It, How it Entered the Pet Food Supply Chain, and what You Can Do To Protect Your Canines & Felines," March 1, 2017, https://www.thehonestkitchen.com/blog/pentobarbital-entered-pet-food-supply-chaincan-protect-pet/

food they produce is safe for consumption and properly labeled including verifying the identity and

safety of the ingredients from suppliers.[5] "It is not acceptable to use animals euthanized with a

chemical substance in pet or other animal foods . . . The detection of pentobarbital in pet food

renders the product adulterated. It is the responsibility of the manufacturer to take the appropriate

steps to ensure that the food they produce is safe for consumption and properly labeled." [6]

5.      Pentobarbital residue from euthanized animals will continue to be present in pet

food, even if it is rendered or canned at high temperature or pressure.[7]

6.      Pentobarbital is routinely used to euthanize animals, and the most likely way it could

get into dog food would be in rendered animal products. Rendered products come from a process

that converts animal tissues to feed ingredients, including tissues from animals that have been

euthanized, decomposed or were diseased. Pentobarbital from euthanized animals survives the

rendering process and could be present in the rendered feed ingredients used in pet food. The

FDA's testing of dry dog food confirmed some samples contained pentobarbital. The FDA

concluded that pentobarbital was entering pet foods from euthanized, rendered cattle or horses

because of the lack of dog and cat DNA.

7.      Despite its findings, the FDA has not aggressively taken action under FDCA, § 342

(a)(1) or (5), against the pet food companies that it found to have used non-slaughtered animals and

contain pentobarbital in their pet foods. Therefore, manufacturers in the pet food industry,

including Defendants, have continued their illegal practice of using non-slaughtered animals that

may contain poisonous substances, like pentobarbital, in their pet foods. It is not acceptable to use

animals euthanized with a chemical substance in pet food, and the detection of pentobarbital in pet

food renders the product adulterated.

---

[5] https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm544348
.htm (last visited Feb. 16, 2018)
[6] *Id.*
[7] *Id.*

8.      Here, it has been revealed that Defendants knowingly, recklessly and/or negligently sold Contaminated Dog Food containing pentobarbital, a substance largely used to euthanize animals.

9.      On February 8, 2018, it was reported on WJLA that an independent investigation determined that the Contaminated Dog Food contained pentobarbital. The independent investigation utilized two independent labs and both showed the inclusion of pentobarbital in the Contaminated Dog Food.

10.     Defendants knew the real risk that pentobarbital may appear in the Contaminated Dog Food if the manufacturing and sourcing were not properly monitored. Indeed, this is not the first time that the Kibbles 'n Bits line of food has been determined to include pentobarbital: "Back in 2001 analyses by the FDA found residue of the sedative in popular brands like Nutro, Gravy Train and Kibbles 'n Bits."[8]

11.     Consumers have increasingly become more aware and cautious about the products they purchase.

12.     Additionally, Defendants knew that a consumer would be feeding the Contaminated Dog Food multiple times each day to his or her dog. This leads to repeated exposure of the barbiturate to the dog.

13.     Defendants wrongfully advertised and sold the Contaminated Dog Food without any label or warning indicating to consumers that these products contained any level of Pentobarbital or that Defendants utilized animals that have been euthanized as a protein or meat by-product source.

14.     Instead, the advertising and labels intentionally omit any reference to the food being adulterated:

---

[8] https://www.care2.com/causes/fda-says-pet-food-company-cannot-donaterecalled-products-to-shelter.html





15.     Defendants' claim that the Contaminated Dog Food is "100 percent complete and balanced nutrition" without any mention that the Contaminated Dog Food is in fact adulterated with Pentobarbital.[9]



16.     Defendants' material omissions are false, misleading, and reasonably likely to deceive the public. This is true especially in light of the long-standing campaign by Defendants to market all their products, including the Contaminated Dog Food and "providing safe, healthy, and high quality food" with the as healthy and safe with the "purest ingredients."[10]

17.     Moreover, Defendants' Corporate  Responsibility Policy says the top priority is the "safety and quality" of its products:[11]

---

[9] https://www.walmart.com/ip/Kibbles-n-Bits-Dog-Food-Tender-Cuts-with-Real-Turkey-Bacon-Vegetables-in-Gravy-13-2-OZ/23591328.

[10] Big Heart Pet Brands, "Pets," http://www.bigheartpet.com/corporateresponsibility/pets.aspx

[11] 12 Big Heart Pet Brands, Corporate Responsibility Policy," http://www.bigheartpet.com

**Pet food safety and quality.** *Big Heart Pet Brands top priority is the safety and quality of our products. Our goal is to produce the finest pet food products available on the market today. All of our products are made under a system of strict food safety and quality controls combined with ongoing inspection and monitoring. All of our programs are designed to exceed the Global Food Safety Initiative standards. Our products are made with nutritious, quality ingredients that meet the applicable standards and specifications of the U.S. Department of Agriculture (USDA), Association of American Feed Control Officials (AAFCO) and the Food & Drug Administration (FDA). Each of our products is processed and packaged following strict food safety and quality control procedures that comply with the Good Manufacturing Practices established by the FDA. These procedures ensure that the resulting food will be pure, wholesome and safe for pets.*

18.     In this same document, Defendants claim that they have a "rigorous supplier approval process" and only purchase ingredients from "reputable suppliers." According to Defendants, once a supplier is approved, "a comprehensive testing program is in place to assess the safety and quality of the ingredients upon receipt. This includes a combination of laboratory analysis and physical inspection of the ingredients."[12]

19.     Finally, Defendants highlight the strict oversight they supposedly apply across all its brands, include Kibbles 'n Bits, to ensure high quality products "from start to finish, inside and out:"[13]

We apply the same expectations of quality that we hold for ourselves to our suppliers. Our supplier management program includes an extensive evaluation of manufacturing locations and a comprehensive testing program that is used to assess the safety and quality of ingredients upon receipt. This program includes a combination of laboratory analysis and physical inspection.

Through rigorous commitment to the quality of our products—from start to finish, inside and out—Big Heart Pet Brands is able to nurture the bond between pets and the people who love them.

20.     These descriptions, promises, and representations (*i.e.*, Defendants' advertising campaign) are deceptive because there was no label or warning indicating to consumers that these

---

/assets/CRPolicy.pdf
[12] *Id.*
[13] Big Heart Pet Brands, "Corporate Responsibility Summary2014, "http://www.bigheartpet.com/assets/CorporateResponsibilitySummaryBrochure2014.pdf

products contained any level of Pentobarbital or that Defendants utilized animals that have been euthanized as a protein or meat by-product source. Defendants' statements, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Food is healthy, safe, has only pure ingredients, and is manufactured under rigorous standards.

21.     Moreover, a reasonable consumer, such as Plaintiff, and other members of the Class (as defined below), would have no reason to expect and anticipate that the Contaminated Dog Food is made up of anything other than pure ingredients from reputable suppliers and that quality is the top priority as promised by Defendants. Non-disclosure and concealment of any level of Pentobarbital or utilization of animals that have been euthanized as a protein or meat by-product source in the Contaminated Dog Food coupled with the partial disclosures and/or misrepresentations that the food is pure, quality, healthy, and safe by Defendants is intended to and did, in fact, Plaintiff and Class members to purchase a product they would not have bought if the true quality and ingredients were disclosed, including that the Contaminated Dog Food is adulterated. As a result of these false statements, omissions, and concealment, Defendants have generated substantial sales of the Contaminated Dog Food.

22.     Plaintiff brings this action individually and on behalf of all other similarly situated consumers within the United States who purchased the Contaminated Dog Food in order to cause the disclosure of the inclusion of Pentobarbital and/or the utilization of euthanized animals as a protein or meat by-product source in the Contaminated Dog Food; to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Dog Food is high quality, safe, and healthy; and to obtain redress for those who have purchased the Contaminated Dog Food.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over all causes of action asserted herein under the

Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum

or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides

in states other than the states in which Defendants are citizens and in which this case is filed.

Therefore, none of the exemptions to jurisdiction under 28 U.S.C. §1332(d) apply.

24.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiff suffered

injury as a result of Defendants' acts in this district, many of the acts and transactions giving rise to

this action occurred in this district, Defendants conduct substantial business in this district,

Defendants have intentionally availed themselves of the laws and markets of this district, and

Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

25.     Plaintiff is, and at all relevant times has been, a citizen of the state of New York.

Plaintiff purchased certain lines of the Contaminated Dog Food and fed it to her dog named Otto.

Plaintiff primarily purchased the Contaminated Dog Food from Walmart on June 25, August 17,

August 24, September 28, and October 9, 2017. (*See* attached Exhibit 1.) During that time, based on

the false and misleading claims, warranties, representations, advertisements, and other marketing by

Defendants, Plaintiff was unaware that the Contaminated Dog Food contained any level of

Pentobarbital, a substance largely used to euthanize animals.

26.     As the result of Defendants' deceptive and negligent conduct, Plaintiff was injured

when she purchased the Contaminated Dog Food that did not deliver what it promised and did

business with a Company she would not have if she knew that the Contaminated Dog Food

contained any level of Pentobarbital or that Defendants utilized animals that have been euthanized

as a protein source. She purchased the adulterated Contaminated Dog Food on the assumption that

the labeling of the Contaminated Dog Food was accurate and that it was unadulterated, pure, high

quality, healthy, and safe for dogs to ingest and did not include euthanized animals as a protein source. Further, should Plaintiff encounter the Contaminated Dog Food in the future, she cannot rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Food.

27.     Big Heart Pet Brands, Inc., a Delaware corporation, is a subsidiary of The J.M. Smucker Company and its headquarters are located at One Maritime Plaza, San Francisco, California. Big Heart Pet Brands, Inc. manufactures, formulates, produces, distributes, labels, markets, advertises, and sells the Contaminated Dog Food under the Kibbles n' Bits dog food brand name throughout the United States. The advertising for the Contaminated Dog Food, relied upon by Plaintiff, was prepared and/or approved by Defendant Big Heart Pet Brands, Inc. and its agents, and was disseminated by Defendant and its agents. The advertising and labeling for the Contaminated Dog Food was designed to encourage consumers to purchase the Contaminated Dog Food and reasonably misled Plaintiff and the Class, reasonable consumers, into purchasing the Contaminated Dog Food. Big Heart Pet Brands, Inc. owns, manufactures, and distributes the Contaminated Dog Food and created and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Dog Food.

28.     The J.M. Smucker Company, an Ohio corporation, is the parent company of Big Heart Pet Brands, Inc. and its headquarters are located in Orrville, Ohio. The J.M. Smucker Company manufactures, formulates, produces, distributes, labels, markets, advertises, and sells the Contaminated Dog Food under the Kibbles n' Bits dog food brand name throughout the United States. The advertising for the Contaminated Dog Food, relied upon by Plaintiff, was prepared and/or approved by The J.M. Smucker Company and its agents, and was disseminated by Defendant and its agents. The advertising and labeling for the Contaminated Dog Food was designed to encourage consumers to purchase the Contaminated Dog Food and reasonably misled

Plaintiff and the Class, reasonable consumers, into purchasing the Contaminated Dog Food. The J.M. Smucker Company owns, manufactures, and distributes the Contaminated Dog Food and created and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Dog Food.

29.     The Contaminated Dog Food, at a minimum, includes the following  brands: *Kibbles 'N Bits* 13.2 oz. Burger Bacon Cheese and Turkey Bacon Vegetable Variety 12-Pack; *Kibbles 'N Bits* 13.2 oz. Beef, Chicken, Vegetable, Meatball Pasta and Turkey Bacon Vegetable Variety Pack; *Kibbles 'N Bits* 13.2 oz. Beef, Chicken, Vegetable, Burger Bacon Cheese and Beef Vegetable Variety Pack; *Kibbles 'N Bits* 13.2 oz. Wet Variety Pack; *Kibbles 'N Bits* 13.2 oz. Chef's Choice Bistro Tender Cuts with Real Beef & Vegetable in Gravy; *Kibbles 'N Bits* Chef's Choice Bistro Tender Cuts with Real Turkey, Bacon & Vegetable in Gravy; and *Kibbles 'N Bits* Chef's Choice Homestyle Tender Slices with Real Beef, Chicken & Vegetables in Gravy; *Kibbles 'N Bits* 12-can Variety Pack – Chef's Choice American Grill Burger Dinner with Real Bacon & Cheese Bits in Gravy, Chef's Choice Bistro Tender Cuts with Real Turkey Bacon & Vegetables in Gravy, 12 pack of 13.2-ounce cans; *Kibbles 'N Bits* 12-Can Variety Pack – Chef's Choice Bistro Hearty Cuts with Real Beef, Chicken & Vegetables in Gravy, Chef's Choice Homestyle Meatballs & Pasta Dinner with Real Beef in Tomato Sauce; *Kibbles 'N Bits* 12-Can Variety Pack – Chef's Choice Homestyle Tender Slices with Real Beef, Chicken & Vegetables in Gravy, Chef's Choice American Grill Burger Dinner with Real Bacon & Cheese Bits in Gravy, Chef's Choice Bistro Tender Cuts with Real Beef & Vegetables in Gravy, 12 pack of 13.2-ounce cans.

## FACTUAL ALLEGATIONS

**I.    The Contaminated Dog Food contains pentobarbital.**

30.     An independent seven month investigation determined that the Contaminated Dog Food contains pentobarbital. The independent investigation utilized two different labs and both showed that the Contaminated Dog Food tested positive for pentobarbital. In fact, it was the only

brand that tested positive for pentobarbital.[14]

31.     The report further stated that pentobarbital is not used on farm animals so if it is not from euthanized dogs, cats or horses, where is the pentobarbital coming from. Defendants have not responded to the specific questions raised and instead stated: "We launched and are conducting a thorough investigation, including working closely with our suppliers, to determine the accuracy of these results and the methodology used."[15]

32.     The FDA has not responded to the findings as disclosed by WJLA.

**II.     Defendants falsely advertised the Contaminated Dog Food as pure, quality, and healthy, while omitting that it is adulterated with pentobarbital.**

33.     Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell their extensive Kibbles n' Bits lines of dry and wet pet food products in New York and across the United States. Defendants claim that they keep rigorous quality and supplier standards from "start to finish" and perform three-tier auditing that includes third-party auditors to ensure pure ingredients are used in its products, including Contaminated Dog Food. But Defendants knew that the Contaminated Dog Food was adulterated.[16]

34.     Defendants chose to advertise, label, and market their Contaminated Dog Food with no disclosure that it contained any level of Pentobarbital. Instead, they advertised, labeled, and marketed its products, including the Contaminated Dog Food, as pure, high quality, healthy, and safe for dogs to ingest. The Contaminated Dog Food is available at numerous retail and online outlets.

35.     Defendants made affirmative misleading representations that its products, including the Contaminated Dog Food, were not adulterated and did not contain any controlled substance,

---

[14] http://wjla.com/features/7-on-your-side/fda-to-investigate-after-abc7-exposeseuthanasia-drug-in-dog-food
[15] *Id.*
[16] http://www.bigheartpet.com/assets/CR-Policy.pdf

including Pentobarbital. Specifically, Defendants promise that all their produces meet USDA, AAFCO, and FDA standards.[17]

36.     This is untrue because the Contaminated Dog Food is adulterated, which is not proper under state and federal laws and regulations. Specifically, under the FDCA, a food is adulterated if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." 21 U.S.C. §342. Under New York law, pet food is considered adulterated if "it bears or contains any poisonous or deleterious substance that may render it injurious to health" or "if damage or inferiority has been concealed in any manner." New York Consolidated Laws, Agriculture and Markets Law § 200.

37.     The Contaminated Dog Food is widely advertised.

38.     The Defendants' webpage and adopted corporate policies repeatedly make the misleading statements about the Contaminated Dog Food described above, without any mention of Pentobarbital, a substance largely used to euthanize animals or that Defendants utilized animals that have been euthanized as a protein or meat by-product source.

39.     As a result of Defendants' omissions and misrepresentations, a reasonable consumer would have no reason to suspect the presence of Pentobarbital without conducting his or her own scientific tests or reviewing third-party scientific testing of these products.

## DEFENDANTS' STATEMENTS AND
## OMISSIONS VIOLATED NEW YORK LAWS

40.     New York law is designed to ensure that a company's claims about its products are truthful and accurate. Defendants violated New York law by incorrectly claiming that the Contaminated Dog Food is pure, healthy, quality, and safe and that it offers 100 % complete and balanced nutrition with the purest ingredients, while meeting all relevant federal regulations, when in fact it contains a controlled substance that is not healthy, quality, or pure and causes the product not

---

[17] http://www.bigheartpet.com/assets/CR-Policy.pdf

to meet the so called rigorous supplier standards utilized by Defendants. Defendants chose to omit

that that the Contaminated Dog Food contained Pentobarbital and/or that Defendants utilized

animals that have been euthanized as a protein source in the Contaminated Dog Food.

41.     Defendants' marketing and advertising campaign has been sufficiently lengthy in

duration and widespread in dissemination.

42.     Defendants engaged in this long-term advertising campaign to convince potential

customers that the Contaminated Dog Food is pure, quality, healthy, and safe for consumption and

that it offers 100% complete and balanced nutrition with the purest ingredients.

## PLAINTIFF'S RELIANCE WAS
## REASONABLE AND FORESEEN BY DEFENDANTS

43.     Plaintiff reasonably relied on Defendants' own statements, misrepresentations,

omissions, and advertising concerning the particular qualities and benefits of the Contaminated Dog

Food.

44.     Plaintiff read and relied upon the label of the Contaminated Dog Food in making

her purchasing decisions.

45.     A reasonable consumer would consider the labeling of a product when deciding

whether to purchase. Here, Plaintiff relied on the specific statements and misrepresentations by

Defendants,. which did not disclose that the Contaminated Dog Food was adulterated or contained

Pentobarbital, a substance largely used to euthanize animals.

## DEFENDANTS' KNOWLEDGE AND NOTICE OF THEIR BREACHES
## OF EXPRESS AND IMPLIED WARRANTIES

46.     Defendants had sufficient notice of their breaches of express and implied warranties.

Defendants have and had exclusive knowledge of the physical and chemical make-up of the

Contaminated Dog Food.

47.     Defendants also had notice of the real risk that pentobarbital may appear in the

Contaminated Dog Food if the manufacturing and sourcing were not properly monitored. Indeed, this is not the first time that the Gravy Train line of food has been determined to include pentobarbital.[18]

### PRIVITY EXISTS WITH PLAINTIFF AND THE PROPOSED CLASS

48.     Defendants knew that consumers such as Plaintiff and the proposed Class would be the end purchasers of the Contaminated Dog Food and the target of its advertising and statements.

49.     Defendants intended that the advertising, labeling, statements, and representations would be considered by the end purchasers of the Contaminated Dog Food, including Plaintiff and the proposed Class.

50.     Defendants directly marketed to Plaintiff and the proposed Class through statements on its website, labeling, advertising, and packaging.

51.     Plaintiff and the proposed Class are the intended beneficiaries of the expressed and implied warranties.

### CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action individually and on behalf of the following Class pursuant to Rule 23(a) and 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of the State of New York who, from February 1, 2012, to the present, purchased the Contaminated Dog Food for household or business use and not for resale.

53.     Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, and co-conspirators; all governmental entities; and any judge, justice, or judicial officer presiding over this matter.

54.     This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily

---

[18] https://www.care2.com/causes/fda-says-pet-food-company-cannot-donaterecalled-products-to-shelter.html

ascertainable.

55.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and Court.

56.     Questions of law and fact common to Plaintiff and the Class and Class include, but are not limited to, the following:

a.  whether Defendants owed a duty of care to the Class;

b.  whether Defendants knew or should have known that the Contaminated Dog Food was adulterated or contained Pentobarbital;

c.  whether Defendants represented and continue to represent that the Contaminated Dog Food is healthy, quality, pure, and safe;

d.  whether Defendants represented and continue to represent that the Contaminated Dog Food is manufactured in compliance with all governing regulations;

e.  whether Defendants failed to state that the Contaminated Dog Food is in fact adulterated under Federal and New York law;

f.  whether Defendants' representations and omissions in advertising and/or labeling are false, deceptive, and misleading;

g.  whether those representations and omissions are likely to deceive a reasonable consumer;

h.  whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

i.  whether Defendants continue to disseminate those representations and omissions despite knowledge that the representations are false, deceptive, and

misleading;

j.  whether a representation that a product is healthy, pure, quality, and safe for consumption coupled with omissions that the Contaminated Dog Food was adulterated or contained Pentobarbital is material to a reasonable consumer;

k.  whether Defendants violated New York General Business Law § 349, et seq.;

l.  whether Defendants violated New York General Business Law § 350, et seq.;

m.  whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages; and

n.  whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

57.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

58.     Plaintiff's claims are typical of Class members' claims in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

59.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

60.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class member is small such that, absent representative litigation, it would be infeasible for Class members to redress the wrongs done to them.

61.     Questions of law and fact common to the Class predominate over any questions affecting only individual Class members.

62.     As a result of the foregoing, class treatment is appropriate.

## CAUSES OF ACTION
## COUNT I
### (Negligent Misrepresentation)

63.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

64.     Plaintiff reasonably placed her trust and reliance in Defendants' representations that the Contaminated Dog Food is healthy, safe, pure, high quality, and that it was not adulterated with substances such as Pentobarbital.

65.     Plaintiff reasonably placed her trust and reliance in Defendants to disclose if the Contaminated Dog Food was adulterated, contained Pentobarbital, or utilized euthanized animals as a protein or meat by-product source.

66.     Because of the relationship between the parties, Defendants owed a duty to use reasonable care to impart correct and reliable disclosures concerning the true nature, quality, and ingredients of the Contaminated Dog Food or, based upon its superior knowledge, having spoken, to say enough to not be misleading.

67.     Defendants breached their duty to Plaintiff and the Class by providing false, misleading, partial disclosures, and/or deceptive information regarding the true nature, quality, and ingredients of the Contaminated Dog Food.

68.     Plaintiff and the Class reasonably and justifiably relied upon the information supplied to them by the Defendants. As a result, Plaintiff and the Class purchased the Contaminated Dog Food that should not have been sold at all because it was adulterated.

69.     Defendants failed to use reasonable care in their communications and representations to Plaintiff and Class.

70.     By virtue of Defendants' negligent misrepresentations, Plaintiff and the Class have

been damaged in an amount to be proven at trial or, alternatively, seek rescission and disgorgement under this Count.

## COUNT II
### (Violations of New York's Deceptive Acts and Practices GBL § 349)

71.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.     New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

73.     In its sale of goods throughout the State of New York, Defendants conduct business and trade within the meaning and intendment of New York General Business Law § 349.

74.     Plaintiff and the members of the New York Subclass are consumers who purchased products from Defendants.

75.     Defendants have engaged in deceptive and misleading practices, which include, without limitation, creating an image that the Contaminated Dog Food is healthy, safe, has only pure ingredients, and is manufactured under rigorous standards; representing that the Contaminated Dog Food is pure, quality, healthy, and safe for consumption; failing to make any mention that the Contaminated Dog Food is in fact adulterated by containing the controlled substance of Pentobarbital; and representing that the Contaminated Dog Food is of a particular standard, quality, or grade, when it is in fact adulterated and not fit for consumption, causing Plaintiff and the members of the Class to purchase the Contaminated Dog Food.

76.     By reason of this conduct, Defendants have engaged and continue to engage in deceptive conduct in violation of the New York General Business Law.

77.     Defendants' actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and the members of the Class have sustained from having paid for Defendants' products.

78.     As a direct and proximate result of these violations, Plaintiff and the Class have been harmed, and that harm will continue unless Defendants are enjoined from using the misleading marketing described in any manner in connection with the advertising and sale of the Contaminated Dog Food.

## COUNT III
### (Violations of New York False Advertising Law, GBL § 350)

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

81.     Pursuant to the statute, false advertising is defined as "advertising, including labeling, of a commodity… if such advertising is misleading in a material respect."

82.     As set forth herein, Defendants' claims that the Contaminated Dog Food is healthy and safe for consumption are literally false and likely to deceive the public.

83.     Defendants' claims that the Contaminated Dog Food is pure, quality, healthy, and safe for consumption are untrue or misleading because these claims fail to disclose that the Contaminated Dog Food was in fact adulterated by containing the controlled substance of Pentobarbital.

84.     Defendants' claims that the Contaminated Dog Food is 100% complete and balanced nutrition are untrue or misleading because they fail to disclose that the Contaminated Dog Food was in fact adulterated by containing the controlled substance of Pentobarbital.

85.     Defendants knew, or reasonably should have known, that the claims were untrue or misleading.

86.     Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase these products in the future if they

can be assured that the Contaminated Dog Food is unadulterated and meets the advertising claims.

87.     As a result of Defendants' violations, Plaintiff and the members of the Class have suffered damages and are therefore entitled to recover damages and reasonable attorney's fees from Defendants.

## COUNT IV
### (Breach of Warranty)

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     Defendants made express representations to Plaintiff and the Class that the Contaminated Dog Food is pure, quality, healthy, and safe for consumption and is 100% complete and balanced nutrition.

90.     Defendants also made express representations to Plaintiff and the Class that the Contaminated Dog Food meets all applicable regulations, including that it is not adulterated, by allowing its sale in various stores throughout the United States.

91.     These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

92.     There was a sale of goods from Defendants to Plaintiff and the Class members.

93.     On the basis of these express warranties, Defendants sold the Contaminated Dog Food to Plaintiff and the Class.

94.     Defendants knowingly breached the express warranties by selling the Contaminated Dog Food, which is adulterated and contain Pentobarbital.

95.     Defendants were on notice of this breach because they were aware of Pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the Contaminated Dog Food.

96.     Privity exists because Defendants expressly warranted to Plaintiff and the Class that

the Contaminated Dog Food was pure, quality, healthy, and safe for consumption and is 100%
complete and balanced nutrition.

97.     Plaintiff and the Class reasonably relied on the express warranties by Defendants.

98.     As a result of Defendants' breaches of their express warranties, Plaintiff and the
Class sustained damages because they paid money for the Contaminated Dog Food that was not
what Defendants represented and in fact not properly sold under applicable regulations and law.

99.     Plaintiff on behalf of herself and the Class, seeks actual damages for Defendants'
breach of warranty.

<u>COUNT V</u>
**(Breach of Implied Warranty)**

100.    Plaintiff incorporates by reference and realleges each and every allegation contained
above, as though fully set forth herein.

101.    The Contaminated Dog Food is not fit for ordinary purposes because it was
adulterated or similarly contaminated.

102.    Defendants are merchants engaging in the sale of goods to Plaintiff and the Class.

103.    There was a sale of goods from Defendants to Plaintiff and the Class.

104.    Defendants breached the implied warranties by selling the Contaminated Dog Food
that was not fit for its ordinary purpose because it is adulterated with pentobarbital.

105.    Defendants were on notice of this breach because it was aware of the presence of
pentobarbital and/or the use of euthanized animals as a protein or meat by-product source in the
Contaminated Dog Food.

106.    Privity exists because Defendants impliedly warranted to Plaintiff and the Class that
the Contaminated Dog Food was unadulterated and fit for their ordinary purpose.

107.    As a result of Defendants' breaches of their implied warranties of merchantability,
Plaintiff and the Class sustained damages because they paid money for the Contaminated Dog Food

that was not what Defendants represented.

108.     Plaintiff, on behalf of herself and the Class, seeks actual damages for Defendants' breach of warranty.

## COUNT VI
### (Unjust Enrichment)

109.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.     Plaintiff conferred a tangible economic benefit upon Defendants by purchasing the Contaminated Dog Food. Plaintiff and members of the Class would have expected remuneration from Defendants at the time this benefit was conferred had they known that the Contaminated Dog Food was in fact adulterated and contained Pentobarbital.

111.     As a result of Defendants' deceptive, fraudulent, and misleading packaging, as well as their advertising, marketing, and sales of the Contaminated Dog Food, Defendants were enriched at the expense of the Plaintiff and each member of the Class, through the payment of the purchase price for the Contaminated Dog Food.

112.     Under the circumstances, it would be against equity and good conscious to permit Defendants to retain the ill-gotten benefits that it received from Plaintiff and members of the Class in light of the fact that the Contaminated Dog Food was not as Defendants represented it to be.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against the Defendants as to each and every count, including the following:

A.     an order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B.     an order enjoining Defendants from selling the Contaminated Dog Food until pentobarbital is removed;

C.      an order enjoining Defendants from selling the Contaminated Dog Food in any manner suggesting or implying that it is healthy, pure, quality, and safe for consumption;

D.      an order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.      an order awarding declaratory relief and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein and issuing injunctive relief remedy Defendants' past conduct;

F.      an order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, plus pre- and post-judgment interest;

G.      an order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.      an order requiring Defendants to pay all actual and statutory damages permitted under the Counts alleged;

I.      an order requiring Defendants to pay punitive damages on any count so allowable;

J.      an order awarding attorneys' fees and costs to Plaintiff and the Class; and

K.      an order providing for all other such relief as may be just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:   March 16, 2018

Respectfully submitted,

*/s/ Paul B. Maslo*
Paul B. Maslo
Salvatore C. Badala
Napoli Shkolnik PLLC
360 Lexington Avenue
New York, New York 10017
(212) 397-1000  (Phone)
(646) 843-7603  (Fax)
Email: pmaslo@napolilaw.com
           sbadala@napolilaw.com

Anne Andrews (*pro hac vice pending*)
Andrews & Thornton
4701 Von Karman Ave, Suite 300
Newport Beach, California 92660
(949) 748-1000  (Phone)
(949) 315-3540  (Fax)
Email: aa@andrewsthornton.com

*Counsel for Plaintiff*